**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

**KENNEDY MARR OFFSHORE**                                         CIVIL ACTION
**SINGAPORE PTE LTD.**
                                                                 NO. 12-1985
**VERSUS**
                                                                 SECTION I
**TECHCRANE INTERNATIONAL INC.**

**ORDER AND REASONS**

Before the Court is a motion[1] for summary judgment and a motion[2] for partial summary judgment filed by plaintiff, Kennedy Marr Offshore (Singapore) PTE, Ltd.  Defendant, Techcrane International, Inc., opposes the motions.[3] For the following reasons, the motion for summary judgment is **GRANTED IN PART** and **DENIED IN PART**.  The motion for partial summary judgment is **GRANTED**.

**Background**

Plaintiff, Kennedy Marr Offshore (Singapore) PTE, Ltd. ("Kennedy Marr"), is a ship broker specializing in the markets for the building, sale, and charter of offshore industry vessels and equipment.[4]  Kennedy Marr entered into a Marketing Agreement dated April 25, 2007 with the Levingston Corporation ("Levingston") to market Levingston's liftboat concept worldwide

---

[1] R. Doc. No. 24.

[2] R. Doc. No. 23.

[3] R. Doc. Nos. 33, 34.

[4] Stmt. of Mat. Facts, R. Doc. No. 24-2, at ¶ 1; R. Doc. No. 33-4, at ¶ 1.

1

("the Marketing Agreement").[5]  As remuneration for Kennedy Marr's services, the Marketing

Agreement provides as follows:

> In the case that Levingston sells its design, engineering or other
> services (including but not limited to supervisory services) and/or
> sells, leases or charters equipment (including, but not limited to,
> liftboat units, jacking systems, leg sections, cranes, machinery) to
> any non-US based company then, KML shall be paid by
> LEVINGSTON a commission equal to 2.5% (two and a half per
> cent) of the total gross proceeds received by Levingston, or any of
> its subsidiary, associated or affiliated companies.[6]

Pursuant to the Marketing Agreement, Kennedy Marr introduced Levingston to Ezion

Holdings, Ltd. and its associated company Ezra Holdings, Ltd. (collectively, "the Buyers"), both

of which are Singapore companies.[7]  The introduction resulted in a sale to the Buyers of two

liftboats identified by their shipyard hull numbers 702 and 703 ("Vessels 1&2").[8]  Levingston

provided the design elements for the liftboats.[9] Levingston called upon its "alliance partners,"

Techcrane International, Inc. ("Techcrane") and Elevating Boats, Inc. ("EBI"), to produce key

equipment for the vessels.[10]  Although Levingston "wasn't the broker exactly," it was "very

much a sort of facilitator . . . in the middle coordinating everything."[11]  The alliance partners paid

---

[5] *See* Marketing Agreement, R. Doc. No. 24-6. According to the complaint, "Liftboats service existing offshore infrastructure in shallow water.  Self-propelled and self-elevating, the liftboats are designed to be ultra-versatile vessels which get essential maintenance and servicing work done quickly." Complaint, R. Doc. No. 1, at ¶ 10.

[6] Marketing Agreement, R. Doc. No. 24-6, at p. 2.

[7] Marr Dep., R. Doc. No. 33-1, at pp. 24-30; Stmt. of Mat. Facts, R. Doc. No. 24-2, at ¶¶ 3-4; R. Doc. No. 33-4, at ¶¶ 3-4.

[8] Marr Dep., R. Doc. No. 33-1, at pp. 24-30.

[9] Marr Dep., R. Doc. No. 33-1, at pp. 33-34.

[10] Shad Dep., R. Doc. No. 33-2, at pp. 28-31.

[11] Marr Dep., R. Doc. No. 33-1, at p. 33.

Levingston a fee for directing business to them.[12]  Levingston, in turn, paid Kennedy Marr a commission for the introduction to the Buyers.[13]

While Vessels 1&2 were still being completed, the Buyers ordered two additional liftboats identified by their shipyard hull numbers 705 and 706 ("Vessels 3&4").[14] Techcrane produced equipment for Vessels 3&4 for the sum of $16,645,626.[15]  Rather than directly paying Levingston for bringing in the business, Techcrane agreed to assume Levingston's obligation to pay Kennedy Marr's commission.[16]  According to Kennedy Marr's representative, Alexander Marr ("Marr"), his understanding was that the "basic reasoning behind it was Levingston's own fee was probably not that significant for the third and fourth units.  And, really, it was the equipment that was the main thing."[17] As a result, "Levingston and Techcrane came to an agreement that . . . it was more appropriate for Techcrane to be paying Kennedy Marr's commission."[18]

The agreement was memorialized in a handwritten note drafted by Levingston's representative, Ronald E. Sanders ("Sanders"), which simply states, "Vessels 3&4 2.5% to

---

[12] Shad Dep., R. Doc. No. 33-2, at p. 36.

[13] Marr Dep., R. Doc. No. 33-1, at pp. 34-36.

[14] Shad Dep., R. Doc. No. 33-2, at pp. 41-42.

[15] Shad Dep., R. Doc. No. 33-2, at pp. 41-42; Stmt. of Mat. Facts, R. Doc. No. 24-2, at ¶ 8; R. Doc. No. 33-4, at ¶ 8.

[16] Shad Dep., R. Doc. No. 33-2, at pp. 55-56, 100-01;  Shad Aff., R. Doc. No. 33-3, at ¶¶ 4, 5.

[17] Marr Dep., R. Doc. No. 33-1, at p. 54.  According to Marr, Levingston's fee for the design elements was likely smaller for Vessels 3&4 because "[t]hey were essentially sister  units, the same, the same as the first two. There was  no significant -- There might have been some minor changes, but they were basically the same things."  Marr Dep., R. Doc. No. 33-1, at p. 38; *see also* Shad Dep., R. Doc. No. 33-2, at pp. 40-41 ("It was a repeat.").

[18] Marr Dep., R. Doc. No. 33-1, at p. 42.

KM."[19] The note was signed by Sanders and Techcrane's representative, Farhad Shad ("Shad") and dated February 6, 2008.[20]  On July 26, 2010, Marr sent an email to Shad reminding him that "KM are [sic] due to be paid 2.5% commission on the equipment sold to Ezion/Ezra for hulls 705/706."[21]  Shad responded the next day stating that Techcrane had "the intention of settling your account before the years end."[22]  Shad also confirmed the amount due: "Total selling price of components for two vessels less the price of power units: 16,645,626.00 x .025 = $416,140.00."[23]

Over the next twelve months, Shad continued to assure Kennedy Marr that Techcrane would pay the $416,140 commission once Techcrane was paid in full by the Buyers. On November 15, 2010, Marr sent an invoice to Techcrane for payment in the amount of $416,140.[24] Shad responded stating, "We await remittance from Ezra.  Once received, we will wire the funds to your designated account."[25]  Kennedy Marr later received an email from Shad on January 10, 2011 stating, "As soon as we receive the funds in full, we will transfer the agreed

---

[19]  Assumption Agreement, R. Doc. No. 24-16.

[20]  Assumption Agreement, R. Doc. No. 24-16; Shad Dep., R. Doc. No. 33-2, at pp. 62-63; Sanders Aff., R. Doc. No. 24-4, at ¶ 8.

[21]  Stmt. of Mat. Facts, R. Doc. No. 24-2, at ¶ 15; R. Doc. No. 33-4, at ¶ 15;  Marr Email, R. Doc. No. 24-3, at pp. 9-11.

[22]  Stmt. of Mat. Facts, R. Doc. No. 24-2, at ¶ 16; R. Doc. No. 33-4, at ¶ 16; Shad Email, R. Doc. No. 24-3, at pp. 13-15.

[23] Stmt. of Mat. Facts,  R. Doc. No. 24-2, at ¶ 16; R. Doc. No. 33-4, at ¶ 16; Shad Email, R. Doc. No. 24-3, at pp. 13-15.

[24]  Stmt. of Mat. Facts, R. Doc. No. 24-2, at ¶ 17; R. Doc. No. 33-4, at ¶ 17;  Invoice, R. Doc. No. 24-3, at p. 18.

[25] Stmt. of Mat. Facts,  R. Doc. No. 24-2, at ¶ 18; R. Doc. No. 33-4, at ¶ 18; Shad Email, R. Doc. No. 24-3, at pp. 19-20.

amount to your account."[26]   On February 22, 2011, Shad sent Kennedy Marr an email advising that it received a letter of credit for the balance of the payment owed to it with the expectation that payment would be received immediately after June 30, 2011.[27]   The email stated, "Once received, the money owed to you will be wire transferred."[28]   When Kennedy Marr inquired as to payment on June 30, 2011, Shad responded on July 12, 2011 that it would "settle our account."[29]

Shad advised Kennedy Marr in his final email that while Techcrane was attempting to produce the equipment for Vessels 3&4, it experienced significant difficulty obtaining progress payments from the Buyers.[30]   Shad explained in his deposition that his company was eventually "blacklisted" by Levingston and the Buyers as a result of his struggle to obtain the progress payments.[31]   Shad further testified that he "sensed very strongly" that Levingston was "creating a rift or not helping to smooth out the rift that had been created by Ezra."[32]   Shad testified that the Buyers later "thumb[ed] their nose at [him]" when they stole his proprietary information and used it to construct cranes based on his designs for two other liftboats, which are identified by their shipyard hull numbers 705B and 1005 ("Vessels 5&6").[33]   Shad stated that Levingston may

---

[26] Stmt. of Mat. Facts,  R. Doc. No. 24-2, at ¶ 19; R. Doc. No. 33-4, at ¶ 19; Shad Email, R. Doc. No. 24-3, at pp. 21-22.

[27] Stmt. of Mat. Facts,  R. Doc. No. 24-2, at ¶ 20; R. Doc. No. 33-4, at ¶ 20; Shad Email, R. Doc. No. 24-3, at p. 23.

[28] Stmt. of Mat. Facts,  R. Doc. No. 24-2, at ¶ 20; R. Doc. No. 33-4, at ¶ 20; Shad Email, R. Doc. No. 24-3, at p. 23.

[29] Stmt. of Mat. Facts,  R. Doc. No. 24-2, at ¶ 21; R. Doc. No. 33-4, at ¶ 21; Shad Email, R. Doc. No. 24-3, at p. 24.

[30] Shad Email, R. Doc. No. 24-3, at p. 24.

[31] Shad Dep., R. Doc. No. 33-2, at pp. 80-97.

[32] Shad Dep., R. Doc. No. 33-2, at p. 92.

[33] Shad Dep., R. Doc. No. 33-2, at pp. 84-88, 90-91.

have even facilitated the theft by allowing the Buyers to use Levingston's patent for Vessels 5&6, which provided "the means to attach the crane onto the jackup boat."[34]

Techcrane eventually received full payment in the amount of $16,645,626 for the equipment Techcrane produced for Vessels 3&4.[35]  However, despite its assurances to Kennedy Marr that it would pay the commission once it had been paid by the Buyers, Kennedy Marr claims that Techcrane has not paid the $416,140 commission.[36]

On August 1, 2012, Kennedy Marr filed this lawsuit to recover the $416,140 commission, asserting breach of contract, detrimental reliance, and procuring cause as grounds for recovery.[37] Techcrane denied the allegations in the complaint and asserted four affirmative defenses, generally alleging that: (1) the agreement is void because plaintiff and others failed to act in good faith by misappropriating Techcrane's proprietary information; (2) the agreement is illegal and unenforceable pursuant to law; (3) Techcrane relied upon plaintiff and others to act in good faith, they did not act in good faith, and they breached their obligations to perform their contractual obligations; and (4) plaintiff engaged in unfair trade practices, defamation of Techcrane, used confidential and proprietary information inappropriately, and tortiously interfered with Techcrane's contractual arrangements.[38]

---

[34] Shad Dep., R. Doc. No. 33-2, at pp. 86-87, 92.  Shad testified that the patent "has nothing to do with the crane.  It has nothing to do with [the] jackup boat itself.  It's this interface only, how to attach it.  And [Sanders] owns the patent."  R. Doc. No. 33-2, at p. 87.

[35] Stmt. of Mat. Facts,  R. Doc. No. 24-2, at ¶ 12; R. Doc. No. 33-4, at ¶ 12.

[36] Complaint, R. Doc. No. 1, at ¶ 19.

[37] Complaint, R. Doc. No. 1.

[38] Answer, R. Doc. No. 5.

Kennedy Marr now seeks summary judgment on its principal demand for the $416,140 commission, plus attorney's fees, interest, and costs.[39]   Kennedy Marr filed a separate motion seeking partial summary judgment with respect to Techcrane's affirmative defenses.[40] Techcrane opposes both motions.[41]   Techcrane argues that the assumption memorialized in the handwritten note does not satisfy the formal requirements under Louisiana law for assumptions of obligations.[42]   Techcrane argues that even if the agreement does not fail for want of form, its agreement to pay Kennedy Marr a $416,140 commission exceeds Levingston's true obligation to Kennedy Marr under the Marketing Agreement.[43] Techcrane contends that it is bound only to the extent of Levingston's actual obligation to Kennedy Marr under the Marketing Agreement.[44] Techcrane also contends that its consent to the assumption was vitiated by error and/or fraud.[45] Finally, Techcrane argues that it is not required to pay Kennedy Marr's commission because Levingston failed to uphold its obligations under the agreement.[46]

## Standard of Law

Summary judgment is proper when, after reviewing the pleadings, the discovery and disclosure materials on file, and any affidavits, the court determines there is no genuine issue of material fact.  *See* Fed. R. Civ. P. 56.  The party seeking summary judgment always bears the

---

[39] R. Doc. No. 24.

[40] R. Doc. No. 23.

[41] R. Doc. Nos. 33, 34.  Techcrane does not oppose summary judgment with respect to its fourth affirmative defense.

[42] R. Doc. No. 33.

[43] R. Doc. No. 33.

[44] R. Doc. No. 33.

[45] R. Doc. No. 33.

[46] R. Doc. No. 33.

initial responsibility of informing the court of the basis for its motion and identifying those portions of the record that it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The party seeking summary judgment need not produce evidence negating the existence of material fact, but need only point out the absence of evidence supporting the other party's case.  *Id.*; *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1195 (5th Cir. 1986).

Once the party seeking summary judgment carries its burden pursuant to Rule 56, the other party must come forward with specific facts showing that there is a genuine issue of material fact for trial.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  The showing of a genuine issue is not satisfied by creating "'some metaphysical doubt as to the material facts,' by 'conclusory allegations,' 'unsubstantiated assertions,' or by only a 'scintilla' of evidence." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (citations omitted).  Instead, a genuine issue of material fact exists when the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The party responding to the motion for summary judgment may not rest upon the pleadings, but must identify specific facts that establish a genuine issue.  *Id.*  The nonmoving party's evidence, however, "is to be believed, and all justifiable inferences are to be drawn in [the nonmoving party's] favor." *Id.* at 255; *see Hunt v. Cromartie*, 526 U.S. 541, 552 (1999).

## Discussion

Kennedy Marr alleges that Techcrane entered into a valid contract to assume Levingston's obligation to pay Kennedy Marr's 2.5% commission for the sale of Vessels 3&4. The Louisiana Civil Code provides "special regulations for assumptions of obligations."  La.

Civ. Code art. 1821 cmt. (b); *see generally* Saul Litvinoff, 5 La. Civ. L. Treatise, Law of Obligations, Chapter 10 (2d. ed. 2012).  "An obligor and a third person may agree to an assumption by the latter of an obligation of the former. To be enforceable by the obligee against the third person, the agreement must be made in writing."  La. Civ. Code art. 1821.  "A person who, by agreement with the obligor, assumes the obligation of the latter is bound only to the extent of his assumption. The assuming obligor may raise any defense based on the contract by which the assumption was made."  La. Civ. Code art. 1822.  Because Levingston and Techcrane agreed to an assumption by Techcrane of Levingston's obligation to pay Kennedy Marr's commission, the Court must analyze the motions for summary judgment in light of the "special regulations for assumptions of obligations."  *See* La. Civ. Code art. 1821 cmt. (b).

## I.  The Handwritten Note

Techcrane first argues that the formal requirements for assumptions of obligations are not satisfied by the handwritten note, which states only: "Vessels 3&4 2.5% to KM."  The Louisiana Civil Code provides, "An obligor and a third person may agree to an assumption by the latter of an obligation of the former. To be enforceable by the obligee against the third person, the agreement must be made in writing."  *See* La. Civ. Code art 1821.  Although the U.S. Court of Appeals for the Fifth Circuit has noted that "a promise to pay the debt of a third person must be explicit, clear, and in writing," *United States v. Park Towers, Inc.*, 8 F.3d 306, 310 (5th Cir. 1993) (citing La. Civ. Code art. 1821), the inquiry is not necessarily limited to the four corners of the contract.  Parol evidence is normally prohibited when "offered to prove the existence of a contract required by law to be in writing," but it may be admissible to aid "the interpretation of assumptions of obligations."  *Wuellner Oil & Gas, Inc v. EnCana Oil & Gas (USA) Inc.*, 861 F. Supp. 2d 775, 782 (W.D. La. 2012) (Foote, J.) ("Louisiana courts routinely apply normal parol

evidence principles to determine whether to admit parol evidence to interpret contracts that are required by law to be in writing.").  Additionally, "parol evidence is competent to prove the assumption of a debt by one who is activated by a pecuniary interest of his own in making the agreement." *Cole v. Joshua*,  575 So. 2d 859, 862 (La. Ct. App. 2d Cir. 1991) (quoting *B. & B. System, Inc. v. Everett*, 34 So. 2d 521 (La. Ct. App. 2d Cir. 1948)); *see also Southland Plumbing Supply, Inc. v. Crescent Refrigeration, Inc.*, 542 So. 2d 771, 773-74 (La. Ct. App. 4th Cir. 1989).

Under Louisiana law, "Parol or extrinsic evidence is generally inadmissible to vary the terms of a written contract unless the written expression of the common intention of the parties is ambiguous." *Campbell v. Melton*, 817 So. 2d 69, 75 (La. 2002). "A contract is considered ambiguous on the issue of intent when either it lacks a provision bearing on that issue, the terms of a written contract are susceptible to more than one interpretation, there is uncertainty or ambiguity as to its provisions, or the intent of the parties cannot be ascertained from the language employed." *Id.* "When a court determines as a matter of law that a contract is ambiguous, then extrinsic (parol) evidence may be used to determine the true intent of the parties, and determining the intent of the parties becomes, in part, a question of fact." *Eiche v. E. Baton Rouge Parish Sch. Bd.*, 623 So. 2d 167, 170 (La. Ct. App. 1st Cir. 1993).

"Summary judgment is seldom appropriate where there is a question as to what was intended by certain provisions of a contract." *Id.*  However, summary judgment may be granted if the Court determines that there are no genuine issues of material fact. *See id.* ("In this posture, the granting of a summary judgment is appropriate only if there is no genuine issue as to material fact."); *Guidry v. American Public Life Ins. Co.*, 512 F.3d 177, 181 n.5 (5th Cir. 2007) ("Granting summary judgment on an ambiguous contract may be appropriate only in the very rare circumstance where 'there is no issue of material fact concerning the pertinent intent' of the

parties."); *see also Nautilus Ins. Co. v. Curtis Indus. Painting Co., Inc.*, No. 98-339, 1998 WL 404651, at *3 (E.D. La. July 17, 1998) (Vance, J.) (explaining that even if an insurance policy was ambiguous, the uncontested parol evidence made clear the parties' intent).

In this case, Techcrane agreed, in writing, to assume Levingston's obligation to pay Kennedy Marr's 2.5% commission for the sale of Vessels 3&4. As Techcrane observes, however, the handwritten note is reasonably susceptible to more than one interpretation because it does not expressly identify what the commission should be based on. Although Kennedy Marr has necessarily resorted to parol evidence on this issue, the intent of the parties is clearly established through undisputed evidence that Techcrane "absolutely" agreed to pay Kennedy Marr's 2.5% commission on the sale price of the equipment provided by Techcrane for Vessels 3&4. *See* Marr Dep., R. Doc. No. 33-1. at pp. 47-48, 54, 78-79; Marr Aff., R. Doc. No. 24-3; Sanders Aff., R. Doc. No. 24-4, at ¶ 8 ("Techcrane absolutely was aware that the amount due to KM would be based on the sale price of the equipment for these two liftboats."); Shad Dep., R. Doc. No. 33-2, at pp. 58-60 ("My understanding was that the 2 1/2 percent was going to be on the equipment that I was building."); Shad Aff., R. Doc. No. 33-3, at ¶ 6. Representatives of Kennedy Marr, Levingston, and Techcrane all agree that this was their understanding at the time of the agreement. *See* Marr Dep., R. Doc. No. 33-1. at pp. 47-48, 54, 78-79; Marr Aff., R. Doc. No. 24-3; Sanders Aff., R. Doc. No. 24-4, at ¶ 8; Shad Dep., R. Doc. No. 33-2, at pp. 55-60; Shad Aff., R. Doc. No. 33-3, at ¶ 6. Additionally, the parties repeatedly confirmed this understanding through numerous email exchanges that took place over the course of a year. *See* Marr Aff., R. Doc. No. 24-3 (authenticating email exchanges).

Techcrane has not shown that there are any genuine issues of material fact as to whether it "clearly assumed the debt" of Levingston. *See Park Towers, Inc.*, 8 F.3d at 310; *Southland*

*Plumbing Supply*, 542 So. 2d  at 773-74. The formal requirements for assumptions of obligations are satisfied by the handwritten note and the undisputed parol evidence that Techcrane agreed to assume Levingston's obligation to pay a 2.5% commission on the equipment side of the transaction.  *See also* Saul Litvinoff, 5 La. Civ. L. Treatise, Law of Obligations, at 10.12 (2d. ed.) ("[T]he writing here discussed may be a very informal one, even a simple notice given to the obligee by both the obligor and the third person, advising him that the latter has assumed the obligation of the former.").  Accordingly, the assumption is not "void for want of form."

**II. The Marketing Agreement**

Techcrane next argues that the assumption is only enforceable to the extent of Levingston's obligation to Kennedy Marr under the Marketing Agreement. *See* La. Civ. Code art. 1822.  Techcrane argues that under the express terms of the Marketing Agreement, Kennedy Marr's commission must be determined based on amounts "received by Levingston, or any of its subsidiary, associated or affiliated companies." Techcrane contends that the $16,645,626 it received directly from the Buyers cannot generate a commission under the Marketing Agreement because such amounts were not "received by Levingston, or any of its subsidiary, associated or affiliated companies."

Kennedy Marr responds that the parties agreed that the commission would be based on amounts received by Levingston and its "alliance partners," which it contends qualify as "associated or affiliated" companies. Kennedy Marr contends that Techcrane should not be permitted to avoid summary judgment by relying on a construction of the Marketing Agreement that is at odds with the construction given by the agreement's signatories.  Kennedy Marr also argues that Marr reached a specific oral agreement with Sanders that the commission for Vessels 3&4 would be determined based exclusively on amounts received by Techcrane.

12

**A. "Subsidiary, Associated or Affiliated"**

As a preliminary matter, the Court agrees with Techcrane that Techcrane is not a "subsidiary, associated or affiliated compan[y]" of Levingston. "The words of a contract are to be construed using their plain, ordinary and generally prevailing meaning, unless the words have acquired a technical meaning." *Guidry v. Am. Public Life Ins. Co.*, 512 F.3d 177, 181 (5th Cir. 2007) (citing La. Civ. Code art. 2047). "Words of art and technical terms must be given their technical meaning when the contract involves a technical matter." La. Civ. Code art. 2047. "Within the interpretive principle of La. C.C. art. 2047, a legal term can have a generally prevailing meaning within the law that the parties to the contract can mutually intend to employ for their contract." *Hoover Tree Farm, L.L.C. v. Goodrich Petro. Co.*, 63 So. 3d 159, 168-69 & n.12 (La. Ct. App. 2d Cir. 2011).

As Techcrane notes, the phrase "subsidiary, associated or affiliated companies" employs legal terms commonly used in business to denote companies related by a certain degree of ownership and/or control.  *See Black's Law Dictionary* (9th ed.) (providing relevant definitions for "subsidiary corporation" and "affiliate"). *Cf. Braun v. Ins. Co. of N. Am.*, 488 F.2d 1066 (5th Cir. 1974) (discussing the term "affiliate"); *St. Paul Fire & Marine Ins. Co. v. Mayor's Jewelers of Fort Lauderdale, Inc.*, 465 F.2d 317 (5th Cir. 1972) (discussing the phrase "associated with"). Kennedy Marr has come forward with no evidence that Levingston has any ownership interest in Techcrane or that it otherwise exercised control over Techcrane. It is not entitled to summary judgment on the ground that Techcrane is a "subsidiary, associated or affiliated compan[y]" described in the Marketing Agreement.

**B. Modification by Subsequent Oral Agreement**

The Court nevertheless agrees with Kennedy Marr that the Marketing Agreement was modified by a subsequent oral agreement. "Louisiana law provides that a court may, 'in the interest of justice,' consider testimonial evidence 'to prove that the written act was modified by a subsequent and valid oral agreement.'" *King v. Univ. Healthcare Sys.*, 645 F.3d 713, 719 (5th Cir. 2011) (quoting La. Civ. Code art. 1848). "[M]odification can be presumed by silence, inaction, or implication." *L & A Contracting Co., Inc. v. Ram Indus. Coatings, Inc.*, 762 So. 2d 1223, 1232 (La. Ct. App. 1st Cir. 2000). "It is a question of fact . . . as to whether there were oral agreements that modified the written contract." *Pelican Elec. Contractors v. Neumeyer*, 419 So. 2d 1, 5 (La. Ct. App. 4th Cir. 1982). "The party asserting modification of an obligation must prove by a preponderance of the evidence facts or acts giving rise to the modification." *Big D Dirt Servs. v. Westwood, Inc.*, 653 So. 2d 604 (La. Ct. App. 3d Cir. 1995) (citing La. Civ. Code art. 1831).

This case presents an unusually compelling circumstance in which the interests of justice strongly counsel in favor of considering undisputed testimonial evidence that a written act was modified by a subsequent and valid oral agreement. The uncontroverted facts show that the Marketing Agreement was specifically modified by a subsequent oral agreement between Marr and Sanders that the commission would be determined based exclusively on amounts received directly by Techcrane. *See* La. Civ. Code art. 1848. Marr explained that this arrangement reflected an agreement with Sanders that was "slightly different" from the express terms of the Marketing Agreement in order to accommodate the fact that the "structure changed . . . so that the buyers were paying Techcrane directly." Marr testified in his deposition as follows:

> QUESTION: When Farhad advised you he would make payments to you of the 2.5 percent that Levingston originally agreed to make, did you understand that Farhad was agreeing to make those

payments on behalf of Levingston or on behalf of the alliance partnership?

MARR:  If you mean was that arrangement superseding what was sort of in place under the general agreement, then yeah.[47]

* * *

QUESTION:  The agreement . . . says you get 2.5 percent of the total gross proceeds received by Levingston.

MARR: Yeah. That's in the case that all the equipment stuff is coming through Levingston essentially.

QUESTION: All right. So --

MARR: When the structure changed or when it was done so that the buyers were paying Techcrane directly, it was slightly -- you know, handled in a slightly different way or it was agreed --

QUESTION: It was agreed to be 2.5 percent of what?

MARR: On the value of the equipment which Techcrane was supplying to the buyers.[48]

Marr further stated that, for Vessels 3&4, he specifically agreed to accept a commission based exclusively on amounts received directly by Techcrane for the equipment side of the transaction.  Marr explained:

Essentially, if I understand it right, there's two portions. One is the equipment side of it, you know, Techcrane and EBI's cranes and jacking systems and stuff, the cost of that. And then the second portion, which in the case of these hulls 3 and 4 was probably very small, was Levingston's fee or, you know, that sort of side of things.

So actually what we were doing is accepting less than if it had been done the normal way because there was nothing on that other portion. When Sanders came along and said, "Look. Here's the deal. You'll just get 2 1/2 percent on the equipment from

---

[47] Marr Dep., R. Doc. No. 33-1, at p. 59.

[48] Marr Dep., R. Doc. No. 33-1, at pp. 78-79.

Techcrane. Is that okay?" I said, "Yes." Actually, that's a concession by us in the big picture."[49]

Marr's assertion that the oral agreement was actually a "concession" is supported by the record. For Vessels 1&2, Marr stated that Levingston paid Kennedy Marr a commission of approximately $600,000 based on "the equipment that was part of the deal and the whole design project management, Ron Sanders, his own fee, whatever that was." Marr Dep., R. Doc. No. 33-1, at pp. 35-37. Shad specifically testified in his deposition that Techcrane received payments directly from Ezra for Vessels 1&2, albeit untimely payments. Shad Dep., R. Doc. No. 33-2, at p. 44, lines 14-20; pp. 43-47.

Clearly then, notwithstanding the express terms of the Marketing Agreement, Levingston paid Kennedy Marr a commission for Vessels 1&2 that was based, in part, on amounts received directly by Techcrane. Even if that were not the case, however, Marr's testimony demonstrates that the agreement was specifically modified for Vessels 3&4 when Sanders "came along and said, 'Look. Here's the deal. You'll just get 2 1/2 percent on the equipment from Techcrane. Is that okay?' I said, 'Yes.'" Marr Dep., R. Doc. No. 33-1, at p. 78.

In fact, representatives of Kennedy Marr, Levingston, and Techcrane have all agreed in one form or another that this was their understanding of the agreement. Marr clearly testified that Kennedy Marr was owed a commission based on the equipment provided by Techcrane. *See* Marr Dep., R. Doc. No. 33-1, at pp. 47-49, 54, 78-79; Marr Aff., R. Doc. No. 24-3. Sanders' affidavit shows that this was his understanding as well. *See* Sanders Aff., R. Doc. No. 24-4, at ¶ 8. Shad similarly testified that Techcrane agreed to pay Kennedy Marr a 2.5% commission on "the equipment that [he] was building," and that his "understanding was that [he] was paying it by instructions of Sanders to Kennedy Marr." Shad Dep., R. Doc. No. 33-2, at pp. 55-56, 59-60;

_____

[49] Marr Dep., R. Doc. No. 33-1, at p. 78.

16

Shad Aff., R. Doc. No. 33-3, at ¶ 6.  The parties repeatedly confirmed that understanding through numerous email exchanges that took place over the course of a year.  *See* Marr Aff., R. Doc. No. 24-3.  Techcrane did not take Sanders' deposition and explore this issue further; it cannot now rest on the Marketing Agreement in an attempt to inject "metaphysical doubt" into the uncontroverted evidence concerning the agreement between Shad, Sanders, and Marr.  *See Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994).  Techcrane has failed to show that genuine issues of material fact exist with respect to the amount of the assumption.

## III. Error and/or Fraud

Techcrane's defense to the amount of the assumption is essentially a claim that its consent was vitiated by error and/or fraud.  *See* La. Civ. Code art. 1948, *et seq*.  Techcrane argues that Kennedy Marr, for "unknown" reasons, reached an "undisclosed agreement" to induce Techcrane to pay an "inflated commission."[50]  Techcrane claims that Kennedy Marr and Levingston "set Techcrane up to pay a dramatically higher commission," and that "this substitution was intentional."[51]  Techcrane argues that it never would have agreed to the assumption if it had known that Levingston "grossly exaggerated the extent of its commission responsibility to Kennedy Marr."[52]

Techcrane did not raise the affirmative defenses of error and fraud in its pleadings.  "[U]nder Fifth Circuit law it is clear that an affirmative defense must, at minimum, provide 'enough specificity or factual particularity to give the plaintiff "fair notice" of the defense that is being advanced.'" *United States v. Brink*, No. 10-243, 2011 WL 835828, at *3 (S.D. Tex. Mar. 4,

---

[50] R. Doc. No. 33, at p. 7.

[51] R. Doc. No. 33, at p. 6.

[52] R. Doc. No. 33, at p. 1.

2011) (Jack, J.) (quoting *Woodfield v. Bowman*, 193 F.3d 354, 362 (5th Cir. 1999)).  "When asserting fraud or mistake in counterclaims or affirmative defenses, the pleader must assert fraud or mistake there with particularity." Steven Baicker-McKee et. al., Federal Civil Rules Handbook 374 (2012); *see also* Fed. R. Civ. P. 9(b); *Siemens Med. Solutions USA, Inc. v. Sunrise Med. Tech. Inc.*, No. 04-2711, 2005 WL 615747, at *4  (N.D. Tex. Mar. 16, 2005) (Sanders, J.) ("Defendant's affirmative defense of fraud is analyzed under the particularity requirement of Rule 9(b)."); *Cosmetic Warriors Ltd. v. Lush Boutique, L.L.C.*, No. 09-6381, 2010 WL 481229, at *2 (E.D. La. Feb. 1, 2010) (Berrigan, J.) (same).  "At a minimum, Rule 9(b) requires allegations of the particulars of time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby." *Benchmark Elec., Inc. v. J.M. Huber Corp.*, 343 F.3d 719, 724 (5th Cir. 2003). "Put simply, Rule 9(b) requires the complaint to set forth 'the who, what, when, where, and how' of the events at issue." *Dorsey v. Portfolio Equities, Inc.*, 540 F.3d 333, 338-39 (5th Cir. 2008) (citing *ABC Arbitrage Plaintiffs Grp. v. Tchuruk*, 291 F.3d 336, 350 (5th Cir. 2002)).

     Techcrane raised four affirmative defenses in its answer.  None of them alleged error or fraud.  Although Techcrane claims that it learned the facts underlying its claims of error and fraud "a couple of days" before Shad's deposition on March 20, 2013 when it received a copy of the Marketing Agreement for the first time, see Shad Dep., R. Doc. No. 33-2, at 101, Techcrane never filed a motion for leave to amend its answer to assert the affirmative defenses of error and fraud.  More importantly, even if properly raised, Techcrane has no evidence to support its sweeping claims of fraud.  Accordingly, Techcrane has waived the affirmative defenses of error and fraud and, even if not waived, it has failed to demonstrate that genuine issues of material fact preclude summary judgment.

#### IV.  Levingston's Alleged Breach of Contract

Techcrane's final defense to Kennedy Marr's principal demand is that Levingston failed to satisfy its obligations to Techcrane under the assumption agreement.  *See* La. Civ. Code art. 1822 ("The assuming obligor may raise any defense based on the contract by which the assumption was made.").  Techcrane contends that Levingston breached its "relationship-management duty" and its duty to discharge its obligations in good faith by failing to act as an intermediary to resolve Techcrane's issues with the Buyers and by allowing the Buyers to use Levingston's patent to build Vessels 5&6 with equipment based on Techcrane's designs.

The Louisiana Civil Code recognizes an implied obligation of good faith in all contracts. *See* La. Civ. Code arts. 1759 and 1983. However, the Fifth Circuit has recognized that "[a] breach of the duty of good faith and fair dealing requires a breach of a contract." *Schaumburg v. State Farm Mut. Auto. Ins. Co.* 421 F. App'x 434, 439 (5th Cir. 2011) (citing *Barbe v. A.A. Harmon & Co.,* 705 So. 2d 1210, 1220 (La. Ct. App. 4th Cir. 1998) and  *Fertel v. Brooks*, 832 So. 2d 297, 306 n. 12 (La. Ct. App. 4th Cir. 2002)).

It is undisputed that Techcrane has been paid $16,645,626 for the equipment it provided in connection with the sale of Vessels 3&4.  As Kennedy Marr notes, Techcrane has not come forward with evidence of any specific terms of its agreement with Levingston or how such terms were breached.  Shad's statements that he "sensed very strongly" that Levingston breached an amorphous "relationship-management duty" are nothing more than "conclusory allegations" and "unsubstantiated assertions" that fail to raise a genuine issue of material fact.  *See Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994); *Clark v. America's Favorite Chicken Co.*, 110 F.3d 295, 297 (5th Cir. 1997) ("Unsupported allegations or affidavit or deposition testimony setting forth ultimate or conclusory facts and conclusions of law are insufficient to defeat a

motion for summary judgment.").  Additionally, the fact that Levingston may have allowed the Buyers to use a patent it rightfully owned for the construction of Vessels 5&6 does not demonstrate a breach of contract or a lack of good faith with respect to the sale of Vessels 3&4. Accordingly, Techcrane has not established that genuine issues of material fact with respect to Levingston's performance preclude summary judgment.

## V. Affirmative Defenses

Techcrane asserted four affirmative defenses in its answer, which generally allege that: (1) the agreement is void because plaintiff and others failed to act in good faith by misappropriating Techcrane's proprietary information; (2) the agreement is illegal and unenforceable pursuant to law; (3) Techcrane relied upon plaintiff and others to act in good faith, they did not act in good faith, and they breached their obligations to perform their contractual obligations; and (4) plaintiff engaged in unfair trade practices, defamation of Techcrane, used confidential and proprietary information inappropriately, and tortiously interfered with Techcrane's contractual arrangements.

Kennedy Marr argues that it is entitled to summary judgment with respect to Techcrane's first and third affirmative defenses because there is no evidence that Kennedy Marr failed to act in good faith by misappropriating Techcrane's proprietary information.  Shad admitted in his deposition that he has no evidence that Kennedy Marr failed to act in good faith or misappropriated Techcrane's proprietary information. *see* Shad Dep., R. Doc. No. 33-2, at pp. 93-94.   Techcrane has also failed to come forward with any evidence that Levingston misappropriated Techcrane's proprietary information.  Having determined that the agreement is also enforceable against Techcrane notwithstanding its unsubstantiated assertions that Levingston failed to act in good faith, misappropriated Techcrane's proprietary information,

20

and/or breached their contractual obligations, Kennedy Marr is entitled to summary judgment with respect to Techcrane's first and third affirmative defenses.

Kennedy Marr next argues that it is entitled to summary judgment as to Techcrane's second affirmative defense namely, that the agreement is illegal and unenforceable pursuant to law.  Although Kennedy Marr argued that "[w]ithout further facts, it's impossible to know why Techcrane thinks any of the underlying agreements are illegal," Techcrane clarified that this defense was based on its arguments regarding "the assumption's vices of form and consent and other grounds for unenforceability."   Having determined that the assumption is not void for want of form, lack of consent, or other grounds for unenforceability, the Court agrees that Kennedy Marr is entitled to summary judgment as to Techcrane's second affirmative defense.

Finally, Kennedy Marr argues that there is no evidence supporting Techcrane's fourth affirmative defense.  Techcrane does not oppose summary judgment with respect to its fourth affirmative defense.  The Court agrees that Techcrane has come forward with no evidence to show that Kennedy Marr engaged in unfair trade practices, defamation, or tortious interference with Techcrane's contractual obligations.

## VI. Attorney's Fees

Kennedy Marr argues that it is entitled to attorney's fees under the Louisiana open account statute, La. Rev. Stat. Ann. § 9:2781, because Techcrane's obligation "bears all of the hallmarks of an open account."   Kennedy Marr contends that its invoice did not include a specific term for payment and that it was based on an underlying agreement that was tied only to a commission percentage.  Kennedy Marr argues that it complied in full with the procedural requirements of the statute and, as such, it should be awarded attorney's fees under the statute.

Techcrane responds that the debt is derived from a contract rather than an open account because it is based on a definite, contractually established commission.  Techcrane argues that the obligation does not bear the typical features of an open account because Kennedy Marr did not extend a line of credit in return for its services and the obligation was not open to future modification or ongoing debit and credit entries.

The Louisiana open account statute provides, in relevant part, as follows:

> When any person fails to pay an open account within thirty days after the claimant sends written demand therefor correctly setting forth the amount owed, that person shall be liable to the claimant for reasonable attorney fees for the prosecution and collection of such claim when judgment on the claim is rendered in favor of the claimant.  Citation and service of a petition shall be deemed written demand for the purpose of this Section.

La. Rev. Stat. Ann. § 9:2781A.

> For the purposes of this Section and Code of Civil Procedure Articles 1702 and 4916, "open account" includes any account for which a part or all of the balance is past due, whether or not the account reflects one or more transactions and whether or not at the time of contracting the parties expected future transactions. "Open account" shall include debts incurred for professional services, including but not limited to legal and medical services. For the purposes of this Section only, attorney fees shall be paid on open accounts owed to the state.

La. Rev. Stat. Ann. § 9:2781D.

"Louisiana courts have defined an open account alternatively as 'an account in which a line of credit is running and is open to future modification because of expectations of prospective business dealings.' "  *Ormet Primary Aluminum Corp. v. Ballast Technologies, Inc.* 436 F. App'x 297, 301 (5th Cir. 2011) (quoting *Tyler v. Haynes,* 760 So. 2d 559, 563 (La. Ct. App. 2000)).   However, the Louisiana Supreme Court has explained that "[u]nder a plain reading of that statute, there is no requirement that there must be one or more transactions between the parties, nor is there any requirement that the parties must anticipate future transactions." *Id.*

(quoting *Frey Plumbing Co. v. Foster*, 996 So. 2d 969, 972 (La. 2008)).   The statute "must be construed 'strictly because the award of attorney fees is exceptional and penal in nature.' " *Id.* (alteration omitted) (quoting *Frank L. Beier Radio, Inc. v. Black Gold Marine, Inc.*, 449 So. 2d 1014, 1015-16 (La. 1984)).

A claim for breach of contract and a claim under the open account statute are considered distinct causes of action.  *Cambridge Toxicology Grp. v. Exnicios*, 495 F.3d 169, 174 (5th Cir. 2007) (citing *Operational Tech. Corp. v. Envtl. Contractors, Inc.*, 665 So. 2d 14, 15 (La. Ct. App. 1st. Cir. 1995)). Louisiana courts have considered several factors when determining whether a course of dealings qualifies as an open account. As stated in *Mid-S. Analytical Labs, Inc. v. Jones, Odom, Spruill & Davis, LLP*, 912 So. 2d 101, 107 (La. Ct. App. 2d Cir. 2005), a few factors, which are  "not wholly determinative, nor exclusive," include whether "(1) the services provided are performed over time involving various projects; (2) the total fee for the services is left open; and (3) billing occurs on a regular basis by the provider of the professional service by sending regular periodic invoices setting forth the amounts for the services performed, e.g. monthly statements." *See also Ormet*,  436 F. App'x at 301("A hallmark of an open account is that '[t]he total cost, unlike a contract, is generally left open or undetermined, although the rate for specific services may be fixed, such as an hourly rate.' ").   Other courts have balanced the following four factors: (1) whether there were other business transactions between the parties; (2) whether a line of credit was extended by one party to the other; (3) whether there are running or current dealings; and (4) whether there are expectations of other dealings." *Cambridge Toxicology Grp.*, 495 F.3d at 174  (citing *Paz v. BG Real Estate Servs., Inc.*, 921 So. 2d 186, 188 (La. Ct. App. 4th Cir. 2005)).  In these respects, courts have observed that "[a]n open account is 'similar to a line of credit.'" *Id.*  (quoting *Hayes v. Taylor*, 812 So. 2d 874, 878 (La. Ct. App. 3d

Cir. 2002)); *see also Construction Testing Labs, Inc. v. Wal-Mart Stores, Inc.*, No. 08-0569, 2009 WL 2214678, 3 (W.D. La. 2009) (Hicks, J.) (noting that whether credit was extended is a "key element").

The Court agrees with Techcrane that its obligation to pay Kennedy Marr's commission is a contract as opposed to an agreement subject to the open account statute. The only factor indicating that Kennedy Marr's claim may qualify as an open account is the fact that the ultimate value of the 2.5% commission was unknown when the agreement was made in February of 2008. It was not until July of 2010 that the amount of the commission could be determined based on the ultimate sale price of the equipment. None of the other factors weigh in favor of finding an open account. Although it attempted to recover the contract price on numerous occasions, Kennedy Marr did not bill its services to Techcrane over time by sending regular periodic invoices for installment payments. It also did not extend any credit to Techcrane. Moreover, once Techcrane had completed the sale of the equipment to the Buyers, Kennedy Marr's commission was fixed and it became due as soon as Techcrane received payment from the Buyers. On balance, Techcrane's obligation was not in the nature of an open account. Accordingly, Kennedy Marr is not entitled to an award of attorney's fees under La. Rev. Stat. Ann. § 9:2781.

**VII.  Interest and Costs**

Kennedy Marr argues that it is entitled to prejudgment interest running from July 12, 2011, the date its commission became ascertainable and due based on Techcrane's receipt of payment from the Buyers. As explained by the Fifth Circuit,

> Louisiana substantive law presumes that interest will be awarded on judgments, La. Civ. Code art 2000, and "a debt or claim for the payment of money or damages under a contract is ascertainable and becomes due on the date an active violation occurred or the

24

> obligor was put in default, which can be earlier but never later than
> judicial demand, and legal interest runs from that date." *Mini Togs
> Products, Inc. v. Wallace,* 513 So.2d 867, 873 (La.App.1987)
> (citing *Alexander v. Burroughs Corp.,* 359 So.2d 607, 613-14
> (La.1978)).

*St. Paul's Evangelical Lutheran Church v. Quick Response Restoration, Inc.*, 381 F. App'x 408,

412 (5th Cir. 2010) (unpublished).  Techcrane has not opposed an award of prejudgment interest

and the Court finds that the calculation of interest suggested by Kennedy Marr is supported by

the law.[53]  The amount owed to Kennedy Marr became ascertainable and due no later than July

12, 2011 when Techcrane had received payment in full by the Buyers.  *See Shad Dep.*, R. Doc.

No. 33-2, at pp. 48-49, 51-52, 91.  Kennedy Marr will also be allowed costs pursuant to Federal

Rule of Civil Procedure 54.

**Conclusion**

For the foregoing reasons,

**IT IS ORDERED** that plaintiff's motion for summary judgment on its principal demand

plus interest and costs is **GRANTED.**   Plaintiff's claim for attorney's fees is **DENIED**.

**IT IS FURTHER ORDERED** that plaintiff's motion for partial summary judgment with

respect to defendant's affirmative defenses is **GRANTED**.

**IT IS FURTHER ORDERED** that the above-captioned matter is **DISMISSED WITH

PREJUDICE**.

New Orleans, Louisiana, June 27, 2013.

LANCE M. AFRICK
UNITED STATES DISTRICT JUDGE

---

[53] This Court ordered Techcrane to respond to Kennedy Marr's request for attorney's fees and prejudgment interest.
*See* R. Doc. No. 41.  Techcrane opposed the request for attorney's fees, but it did not respond to Kennedy Marr's
request for prejudgment interest under Louisiana law. *See* R. Doc. No. 44.